UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 07-10069-RGS

UNITED STATES OF AMERICA

v.

YOEUNG ENG, HONG HAK,
THE NGUYEN, and AMANDA SCOTT

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER ON DEFENDANTS' MOTION TO SUPPRESS

July 30, 2008

STEARNS, D.J.

On January 23, 2007, agents of Immigration and Customs Enforcement (ICE), acting on information supplied by a cooperating witness (CW),[1] seized marihuana, two hand guns, and drug paraphernalia from the first-floor apartment of a two-family home at 55 Dunstable Road in Chelmsford, Massachusetts.  A second search was conducted at a home at 220 Fayette Street in Lowell, Massachusetts.  There agents seized United States currency and a scale.  The searches were conducted under two separate warrants obtained from the Lowell District Court after a "security sweep" of 55 Dunstable Road. Defendants Yoeung Eng, Hong Hak, The (Rosanna) Nguyen, and Amanda Scott were arrested and subsequently indicted for conspiracy to distribute marihuana and for possession of marihuana with the intent to distribute.[2]  Defendants now move to suppress

---

[1]Although the witness's identity is designated as confidential, the witness's name is inadvertently disclosed in the government's brief.  Nonetheless, I will refer to the witness using the masculine case and the government's designation "CW."

[2]No charges were brought with respect to the handguns.

the fruits of the searches.  An evidentiary hearing on the motion was held on October 9,

2007.  The court then granted counsel several enlargements of time in which to obtain a

transcript of the hearing and to submit further briefing, if desired.

FINDINGS OF FACT

Based on the credible evidence, I make the following findings of fact.

1.   On January 22, 2007, Boston-based ICE Special Agent Linda McDonough

received information regarding an imminent shipment of marihuana from upstate New

York.  The information had been given by the CW to ICE agents in New York.  According

to the CW, the marihuana was to be delivered to an unidentified person(s) at an

unidentified location near Boston.  With the CW's cooperation, ICE agents undertook to

make a controlled (supervised) delivery.

2.   Later that day, ICE agents confirmed that the CW had received 108 pounds of

marihuana from his supplier.  The marihuana was packed in two hockey bags concealed

in the trunk of the CW's Chrysler Sebring.  In the agents' presence, the CW dialed the

telephone number that he had been given by his supplier.  A male answering the phone

told the CW that his "sister" would give him directions.  A female then picked up the phone

and instructed the CW to proceed to Exit 38 off Interstate Route 495 in Lowell,

Massachusetts.

3.   At 5:00 p.m., the CW redialed the number and told the male that he was inside

the Applebee's Restaurant at Exit 38.  The CW offered to give the male his car with the

marihuana and to wait at Applebee's while it was being unloaded.[3]

---

[3]The calls to and from the CW were recorded by ICE agents.

4.   Shortly after 8:00 p.m., a white Nissan Armada pulled into the parking lot at Applebee's.[4]  Two Asian males were in the front seat.  An Asian female was seated in the rear.  A call from one of the occupants of the Nissan informed the CW that "they" were outside.  The CW went to the Nissan and gave the male passenger the key to his car.  The Nissan's occupants then drove to a nearby Burger King (without the CW's car).  From there, they drove to the parking lot of a Motel 6, where they met a white male driving a Ford Taurus with New York license plates.  The two cars then drove to 220 Fayette Street in Lowell.  Several Asian males gathered around the Taurus while the white male lifted a box out of the trunk.  Both cars then returned to the parking lot at Applebee's.  The Taurus parked.  The Nissan drove away.[5]

5.   Shortly after the Nissan left Applebee's, the CW received a call stating that "they" were on their way back.  When the Nissan reappeared, the Asian female was the only occupant.  She returned the CW's car key and told him that "uncle felt it wasn't a good idea" because "there were cops in the area."  She told the CW to find a hotel room and wait for a call.

---

[4]The Nissan was registered to a Hak Sik at 220 Fayette Street in Lowell.  According to Agent McDonough, Hak Sik is the father of defendant Hong Hak.

[5]The white male seated himself for dinner in Applebee's, but did not attempt to make contact with the CW.  The white male was stopped by police the next day in Tewksbury, Massachusetts. He identified himself as one Frederic Cazes and gave officers a Canadian address.  The Taurus had been rented by Cazes in New York.  Cazes was arrested for possession of a small amount of marihuana, but according to Agent McDonough, the arrest had nothing to do with defendants' case.

6.  At 9:00 a.m. the following morning, the CW received a call asking if he "was ready."  Arrangements were eventually made to meet at a nearby strip mall.[6]  There the CW found the Nissan and a white minivan waiting.[7]  The CW had been instructed earlier to follow the Nissan when it left the mall.  He was also told that the minivan would bring up the rear to "keep them safe."

7.  From the mall, the CW was led in caravan to 55 Dunstable Road in Chelmsford, Massachusetts (rather than 220 Fayette Street in Lowell as the agents had expected).[8]

8.  The CW parked in the driveway at 55 Dunstable Road next to the Nissan.  A green Cadillac (not previously seen by the agents) was parked on the far side of the driveway.[9]  The minivan pulled behind the CW's car, effectively blocking the CW's exit.

9.  The CW got out of his car and opened the trunk.  One of the males, later identified as Eng, joined the CW and began removing the hockey bags from the trunk. Nguyen stood beside him.  Hong Hak remained in the minivan.

10.  As Eng picked up one of the hockey bags, agents (ten to fifteen in number) made their presence known.  Eng dropped the hockey bag and ran to the yard at the rear

---

[6]According to the caller, the area around the Applebee's was "too hot."

[7]The white minivan was registered to a Hoeun Hak at 220 Fayette Street, who according to Agent McDonough, is the brother of Hak Sik.

[8]Chelmsford adjoins the City of Lowell.

[9]The government offered no evidence as to the ownership of the Cadillac.

of 55 Dunstable Road. There he was quickly apprehended.[10] Nguyen and Hong Hak were arrested in the driveway.

11.   After the arrests were made, at least two agents entered 55 Dunstable Road through the rear door. They searched the first-floor apartment where in the kitchen they arrested Amanda Scott.[11] Scott was dressed in pajamas.[12] The agents observed a heat sealing machine in a bedroom, a hockey bag (similar to those in the CW's trunk) in a second bedroom, and a box of large plastic bags in the living room. Although the dwelling consists of two separate floors, the agents swept only the ground floor. Prior to the sweep, the agents had no indication that anyone was inside the house.

---

[10]According to the agents who arrested Eng, he was running towards the open rear door of the house. The rear door leads to a stairwell and the entrances to two separate apartments, each of which has its own door and lock. According to Agent McDonough, the agents did not learn that the dwelling had been subdivided into separate apartments until they returned that night with a search warrant.

[11]There is no evidence in the record that the door to the first-floor apartment was locked.

[12]According to Agent McDonough, the landlord (who lived on the second floor) later stated that Scott was a regular visitor to the apartment (the landlord was under the impression that Scott lived there). Scott's affidavit says little more than that she was in her pajamas when the agents burst in. It is not entirely clear to the court why such a spare affidavit was filed on so important an issue.

12.  A search of Eng incident to his arrest yielded six cellular phones.[13]  Nguyen was carrying a cellular phone and keys to the Nissan and 55 Dunstable Road.[14]  Hong Hak had three cellular phones on his person.[15]

13.  At the agents' request, Christal Downs, a Lowell police officer, applied to the Lowell District Court for search warrants for 55 Dunstable Road and 220 Fayette Street.[16] The Dunstable Road warrant yielded a pound of marihuana (found in a crisper drawer of the kitchen refrigerator), two hand guns (one found under a bedroom pillow, the other under a love seat cushion in the living room), the previously espied heat sealer, a currency counter, a scale, and eleven hockey bags similar in appearance to those provided to the CW by the supplier.[17]

14.  The search of 220 Fayette Street resulted in the seizure of U.S. currency of an unspecified amount, a scale, and some miscellaneous personal papers.

---

[13]One of these phones was later determined to be the phone used to communicate with the CW.

[14]An additional cellular phone was seized from Nguyen's purse, which she had left in the Nissan.

[15]None of the defendants was carrying any significant amount of cash.  It was known from prior calls recorded by the CW that he personally was to receive no cash payment from the defendant(s) upon delivering the drugs.  Presumably, the payment was to be made later to the supplier.

[16]The application was submitted sometime during the afternoon of January 23. According to Agent McDonough, the searches were conducted at around 7:00 p.m. that night.

[17]Three marihuana cigarettes were seized from Amanda Scott's pocketbook, which was found on an end table in the living room.

15.  The first-floor apartment at 55 Dunstable Road had been leased by defendants

Nguyen and Hong Hak.  According to the landlord, Nguyen paid the monthly rent.  Prior

to the CW being led to 55 Dunstable Road, agents had no knowledge of the existence of

55 Dunstable Road or of the identities of any of its residents.  The house at 220 Fayette

Road is owned by Hak Sik, the father of defendant Hong Hak.  Both Eng and Hak gave

220 Fayette Road as their home address when booked on January 23.

16.  Officer Downs had not been present during the arrests and derived her

information from Agent McDonough.  Downs's affidavit (shorn of its boilerplate) recites the

sequence of events related by the court and then states the following with respect to 55

Dunstable Road.

> All three vehicles exited the parking lot and traveled to 55 Dunstable Road
> in Chelmsford, Massachusetts.  The agents and officers then observed
> Yoeun Eng (operator of the Nissan Armada) walk over to the [CW's] Chrysler
> Sebring and remove a 'hockey' style bag from the trunk of the vehicle.  The
> officers identified themselves as law enforcement officials.  At that time, Eng
> dropped the bag and ran towards the rear of the house.  Hong Hak (operator
> of the minivan) and The Nguyen (passenger in the Armada) stayed in the
> driveway next to the bag that was removed from the trunk. . . . After securing
> the suspects in front of 55 Dunstable Road, agents discovered that the rear
> door of the residence was open and discovered a female later identified as
> Amanda Scott standing inside the residence.[18]  Agents entered the
> residence and conducted a security sweep to insure the safety and security
> of the officer and suspects.  In plain view in one of the bedrooms was a heat
> seal machine, a larger version that is commonly used to package marijuana.
> In the living room in the nightstand, a box of plastic bags (large) were
> observed in plain view.  In a second bedroom there is at least one large
> black hockey style duffel bag similar to the ones that were seized at the stop.

_____

[18]Evidence offered at the hearing did not support the suggestion possibly conveyed
by the phrasing of this sentence that the agents had seen Scott prior to entering the
apartment.  In fact, Agent McDonough testified that the agents entered the apartment not
because they saw Scott or knew that someone was there, but "to make sure that there was
no one else inside the house that could possibly harm or hurt us."

Affidavit at ¶ 7.

17. In applying for the warrant for 220 Fayette Street, in addition to the facts set out

earlier regarding the activity on January 22, Officer Downs included the following.[19]

> At approximately 8:18 PM [on January 22], the officers observed a white
> Nissan Armada, MA license plate 19AC80 registered to Hak Sik at 220
> Fayette Street, Lowell Massachusetts arrived [sic] at the Applebee's parking
> lot.[20]

Affidavit at ¶ 3.

> It was also later learned that [Hong] Hak resided at 220 Fayette Street in
> Lowell.

Affidavit at ¶ 7.

> At approximately 10:45 AM [on January 23] agents and officers knocked on
> the door at the residence of 220 Fayette Street, Lowell MA, identified
> themselves and asked for permission to enter the residence.  The person
> answering the door gave verbal consent for the officials to enter.  The
> officers asked how many people were currently present at the residence and
> asked if they could conduct a security sweep, which the occupants agreed
> to.  Upon completion of the security sweep the officers explained why they
> were at the residence and requested consent to search the residence.  The
> occupants at the house stated that they would not give consent.

Affidavit at ¶ 9.

18. Downs then added the following personal observation.

---

[19]Of salient details, there is one statement in Officer Downs's affidavit that is at material variance with the court's findings.  In paragraph 4, she states: "Trooper Marron then observed the [white male] driver remove a box *and bring it into the residence* [220 Fayette Street]."  (Emphasis added).  At the suppression hearing, Agent McDonough agreed that agents had *not* seen Cazes transfer possession of the box or take it inside 220 Fayette Street.  There is no support in the record for the last six words of the quoted sentence.

[20]Hak Sik is not a defendant in the case.

Based on my training and experience I know that large-scale narcotics dealers don't carry large sums of money on them. They do this for a couple of reasons. One being, that they don't want to get "ripped" of by the person supplying the narcotics. Second they don't want to get stopped by the Police with large sums of money. Based on this information I know that these dealers will leave their money at a safe place. Usually this safe place will be their residence. Once they see the narcotics they will travel to this "safe" place where they would retrieve the money.

Affidavit at ¶ 10.

## APPLICABLE PRINCIPLES OF LAW

1. "Standing" is a shorthand description of the doctrine that limits the protections of the Fourth Amendment to areas in which a defendant can claim a reasonable expectation of privacy. See Rakas v. Illinois, 439 U.S. 128, 138-139 (1978). If the expectation is not reasonable, an intrusion by police is not a "search" in any constitutional sense. Privacy analysis involves a two-part inquiry. First, did the defendant manifest a subjective expectation of privacy in the premises or the property seized? Second, is the expectation one that society is willing to recognize as reasonable? See id. at 143-144 n.12. A defendant bears the burden of proving that she satisfies both prongs of the inquiry. United States v. Cruz Jiminez, 894 F.2d 1, 5 (1st Cir. 1990).

2. The reasonableness of an asserted interest in privacy is determined by the totality of the circumstances. "Thus, the Court has examined whether a person invoking the protection of the Fourth Amendment took normal precautions to maintain his privacy . . . . Similarly, the Court has looked to the way a person has used a location, to determine whether the Fourth Amendment should protect his expectations of privacy. . . . The Court on occasion also has looked to history to discern whether certain types of government

9

intrusion were perceived to be objectionable by the Framers . . . . And, as the Court states today, property rights reflect society's explicit recognition of a person's authority to act as he wishes in certain areas . . . ." Rakas, 439 U.S. at 152-153.  The Court has emphasized repeatedly that the Fourth Amendment accords its highest protections to the home. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  Wilson v. Layne, 526 U.S. 603, 610 (1999), quoting United States v. United States District Court, 407 U.S. 297, 313 (1972).  While naked title is generally not sufficient to implicate Fourth Amendment protections, the law draws no distinction between the owner of a dwelling and a lessee.  See United States v. Winsor, 846 F.2d 1569, 1572 (9th Cir. 1988) (en banc) (room rented in a "flop house").

3.   The protections of the "home" extend beyond members of the immediate household. See Minnesota v. Olson, 495 U.S. 91, 99-100 (1990) (overnight guest); United States v. Rhiger, 315 F.3d 1283, 1287 (10th Cir. 2003) (social guest); United States v. Gamez-Orduno, 235 F.3d 453, 459-461 (9th Cir. 2000) (overnight "business" guest); United States v. Davis, 932 F.2d 752, 757 (9th Cir. 1991) (defendant had a key to a friend's apartment and the freedom to come and go as he pleased); United States v. Pollard, 215 F.3d 643, 647 (6th Cir. 2000) (frequent visitor and occasional overnight guest). Cf. Minnesota v. Carter, 525 U.S. 83, 91 (1998) (a person admitted to a home for a purely commercial transaction has no reasonable expectation of privacy in the dwelling or its contents).

4.  Plain view rises to constitutional significance as a justification for warrantless seizures, not searches.  "It is important to distinguish 'plain view,' as used . . . to justify

*seizure* of an object, from an officer's mere observation of an item left in plain view. Whereas the latter generally involves no Fourth Amendment search . . . , the former generally does implicate the Amendment's limitations upon seizures of personal property." Texas v. Brown, 460 U.S. 730, 738 n.4 (1983) (plurality opinion). "Plain view" is best understood not as an exception to the warrant requirement but as an extension of the prior justification that brings an officer without a warrant into the presence of evidence or contraband. Id. at 738-739. Cf. Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971) (plurality opinion). ("[P]lain view alone is never enough to justify the warrantless seizure of evidence."). In this regard, a useful distinction may be drawn between items in "plain view" and items in "open view." "In the 'plain view' situation, 'the view takes place *after* [a valid] intrusion into activities or areas as to which there is a reasonable expectation of privacy'. . . . In the 'open view' situation, however, the observation takes place from a non-intrusive vantage point." State v. Kaaheena, 575 P.2d 462, 466 (Haw. 1978) (emphasis in original). Evidence that comes into open view by virtue of an illegal entry or other invalid intrusion into a constitutionally protected area may not be used to establish probable cause for its seizure. See Murray v. United States, 487 U.S. 533, 536 (1988). Cf. United States v. Segura, 468 U.S. 796, 802-803 n.4 (1984).

5.   Having executed an arrest inside a dwelling, police may conduct a "sweep search" of the premises if they possess "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 337 (1990). The search "may extend only to a cursory inspection of those spaces where a person may be found," and

may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335-336.[21]

6. Buie also permits a safety sweep in circumstances where officers have reason to fear that they are in imminent danger from the occupants of a dwelling even though the arrest (or a detention) occurs just outside the dwelling. United States v. Hoyos, 892 F.2d 1387, 1397 (9th Cir. 1989)[22] (sweep justified even though defendant was arrested on the steps of his home – "A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another."); see also United States v. Henry, 48 F.3d 1282, 1284 (D.C. Cir. 1995) (arrest in apartment hallway); United States v. Wilson, 306 F.3d 231, 238 (5th Cir. 2002) (same);[23] United States v. Cavely, 318 F.3d 987, 994-996 (10th Cir. 2003) (adjacent driveway); United States v. Lawlor, 406 F.3d 37, 41 (1st Cir. 2005) (same).

7. The officers must have a reasonable basis for believing that a *dangerous* person is hiding inside the premises; the mere presence of a third party does not justify a safety sweep. See United States v. Paradis, 351 F.3d 21, 29 (1st Cir. 2003) (sweep of a

---

[21]Under the second "prong" of Buie, police require no grounds for suspicion to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 325. The second prong is not applicable in this case.

[22]Hoyos has been overruled, although on other grounds. See United States v. Ruiz, 257 F.3d 1030 (9th Cir. 2001) (en banc).

[23]Wilson has been overruled, although on other grounds. See United States v. Gould, 364 F.3d 578 (5th Cir. 2004) (en banc).

residence unreasonable where officers had no reason to believe that an accomplice was inside); <u>United States v. Satterfield</u>, 743 F.2d 827, 844-845 (11th Cir. 1984) (same); <u>United States v. Curzi</u>, 867 F.2d 36, 41-43 (1st Cir. 1989) (warrantless sweep of a third party dwelling unreasonable in the absence of exigent circumstances).  <u>Cf.</u> <u>United States v. Bowdach</u>, 561 F.2d 1160, 1168-1169 (5th Cir. 1977) ("[T]he purpose of this cursory search is to check for persons, not things.").

8.   Where officers, pursuant to <u>Buie</u>, conduct a valid safety sweep of a premises, evidence that comes into plain view may be seized.  <u>See</u> <u>Mincey v. Arizona</u>, 437 U.S. 385, 393 (1978).  <u>See</u> <u>also</u> <u>United States v. Irizarry</u>, 673 F.2d 554, 558 (1st Cir. 1982) (contraband observed during the sweep of a motel room); <u>United States v. Tabor</u>, 722 F.2d 596, 598 (10th Cir. 1983) (same, sweep of house and adjacent barn).

9.   When tainted information infects a warrant affidavit, the redaction doctrine requires a court to excise the offending information from the affidavit and then re-examine the edited affidavit for the existence of probable cause.  <u>See</u> <u>Franks v. Delaware</u>, 438 U.S. 154, 171-172 (1978).[24]  <u>See</u> <u>also</u> <u>United States v. Veillette</u>, 778 F.2d 899, 903-904 (1st Cir. 1985) (after excising information obtained as the result of an illegal entry, sufficient probable cause remained to provide an independent basis for issuance of the warrant);

---

[24]Despite *dicta* to the contrary in <u>Murray v. United States</u>, 487 U.S. 533 (1988), the government is not required to prove that the magistrate would have issued the warrant notwithstanding the inclusion of the tainted information in the affidavit.  <u>See</u> <u>United States v. Restrepo</u>, 966 F.2d 964, 970 (5th Cir. 1992) ("Nothing in <u>Murray</u> [other than a sentence fragment concerning information that might have affected the magistrate's decision] . . . indicates that the Supreme Court intended to reject the prevailing <u>Franks</u>-inspired [excision] rules."); <u>United States v. Dessesaure</u>, 429 F.3d 359, 366-367, 369 (1st Cir. 2005) (same – the focus is "wholly objective").

Doescher v. Estelle, 666 F.2d 285, 288 (5th Cir. 1982) (same).  Cf. United States v. Cook,

657 F.2d 730, 735 (5th Cir. 1981) (the weight of authority favors redaction).

10.  A search warrant may issue on a showing of probable cause – something more

than suspicion, but also something significantly less than the evidence necessary to

convict.  See Henry v. United States, 361 U.S. 98, 100-102 (1959).  "Articulating precisely

what 'reasonable suspicion' and 'probable cause' mean is not possible."  Ornelas v. United

States, 517 U.S. 690, 695 (1996).  Probable cause is concerned with probabilities, "the

factual and practical considerations of everyday life on which reasonable and prudent

men, not legal technicians, act."  Brinegar v. United States, 338 U.S. 160, 175 (1949).

Whether a challenged warrant issued on a sufficient showing of probable cause is a matter

of law to be determined by the reviewing court.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).


11.  A warrant affidavit, in addition to giving reasonable cause to believe that a

crime has been committed, must also establish probable cause to believe that there is a

nexus between the place to be searched, the things to be seized, and the underlying

criminal activity.  United States v. Hove, 848 F.2d 137, 139-140 (9th Cir. 1988).  See

generally 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment,

§ 3.7(d) (4th ed. 2004).  Where there is evidence that a defendant is an established and

successful drug trafficker engaged in an ongoing distribution scheme, an inference may

be drawn that he is likely to keep drugs and business records in his home.  See United

States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999); United States v. Gant, 759 F.2d 484,

488 (5th Cir. 1985); United States v. Whitner, 219 F.3d 289, 297-299 (3d Cir. 2000).  The

mere fact, however, that a defendant has dealt in drugs, without more, will not support such an inference, nor will such an inference be drawn merely from the fact that he has conducted a drug transaction at a place near his home.  See United States v. Carpenter, 367 F.3d 591, 594 (6th Cir. 2003) (en banc); State v. Harp, 697 P.2d 548, 553 (Or. 1985); State v. Silvestri, 618 A.2d 821, 824 (N.H. 1992); Yancey v. State, 44 S.W.3d 315, 322 (Ark. 2001).

## ULTIMATE CONCLUSIONS OF FACT AND LAW

1.  Defendants Hong Hak and Nguyen have standing to challenge the search of 55 Dunstable Road.  Hak and Nguyen were the joint lessees of the first floor apartment. Nguyen paid the rent and had a key to the premises in her purse.

2.  Defendant Scott has standing to challenge the 55 Dunstable Road search.  She had stayed overnight as a guest in the first-floor apartment the night prior to the search and had visited the apartment on a regular basis.

3.  Defendant Eng's only claimed interest in 55 Dunstable Road is the fact that Nguyen is his sister and that he had visited her apartment on occasion.[25]  I rule as a matter of law that adult siblings do not have a reasonable expectation of privacy in one another's homes by the mere virtue of a familial relationship.

4.  Eng claimed 220 Fayette Street as his residence at the booking.  Hong Hak also claimed 220 Fayette Street as a residence.  As a matter of law, an expectation of privacy in a dwelling does not depend on legal or exclusive residency (although these are factors

---

[25]Eng's counsel stated at the hearing that Amanda Scott, the overnight guest, is Eng's girlfriend.  To the extent that it is relevant, Eng has offered no affidavit or personal testimony on any aspect of his relationship to Nguyen or Scott.

to consider).  The government has offered no evidence to rebut Eng's and Hak's claims to reside at 220 Fayette Street.  Therefore, they have standing to challenge the Fayette Street search.  There is no evidence in the record that would confer such standing on Nguyen or Scott.

5.  The agents had no basis before conducting the "security sweep" to believe that a dangerous confederate of the defendants was hiding inside the premises of 55 Dunstable Road.  In fact, they had no basis for believing that anyone at all was inside the house, as all of the targets of the investigation had been accounted for.[26]

6.  The "sweep" being unlawful, the agents' "plain view" observations of the heat sealer, hockey bag, and the box of large plastic bags, while not "seizures" in any constitutional sense, were illegal fruits of the unlawful entry.  As a matter of law, information obtained as the result of an illegal entry may not be used to establish probable cause for a search (even though no physical seizures of evidence are made).[27]

---

[26]While Agent McDonough at first testified that agents did not know where Cazes (the Canadian visitor) was the morning of January 23, she later acknowledged telling the Grand Jury that his Ford Taurus had been earlier observed parked at a Motel 6 and that a surveillance unit had followed him from the Motel 6 to the IHOP restaurant where he was arrested.

[27]Amanda Scott further seeks suppression of all evidence of her identity.  While the matter is not entirely free from doubt, this court is of the view that a person's identity is not protected by the Fourth Amendment.  See Immigration and Naturalization Service v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984) ("The 'body' or identity of a defendant . . . in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred."). Compare United States v. Ortiz-Hernandez, 427 F.3d 567, 577 (9th Cir. 2005) (identity may not be suppressed even in cases of egregious constitutional violations – when the Supreme Court said "'never' suppressible, it meant 'never.'") and United States v. Bowley, 435 F. 3d 426, 430-431 (3d Cir. 2006) (same) with United States v. Olivares-Rangel, 458 F.3d 1104, 1111 (10th Cir. 2006) (holding that Lopez-Mendoza precludes a defendant from

7.   Stripped of the illegal observations of drug paraphernalia, the relevant information remaining in the affidavit does not establish probable cause for the search of 55 Dunstable Road.  The material remnants of the affidavit establish that defendants Eng, Nguyen, and Hak intended to take delivery of the marihuana from the CW in the driveway of 55 Dunstable Road and that defendant Eng attempted to evade arrest by running to the back yard of the house.  Omitting the drug paraphernalia, there is only the weakest of inferences that defendants intended to take the delivered drugs inside 55 Dunstable Road. Both the Nissan and the minivan used by defendants to set up the transaction were registered to 220 Fayette Street.  All of the prior deal-related activity observed by the agents occurred in the front yard and driveway of 220 Fayette Street.   There is no permissible inference that drug money or records of drug dealing (or additional drugs) would be found in the first-floor apartment at Dunstable Road as: (1) the agents had no information connecting defendants with the location (other than their one-time presence in the driveway);[28] (2) no instance of prior drug activity at 55 Dunstable Road was known

---

challenging the court's jurisdiction over his person based on an illegal arrest but does not prevent the suppression of identity-related evidence) and United States v. Guevara-Martinez, 262 F.3d 751, 754-755 (8th Cir. 2001) (same).  Cf. Hayes v. Florida, 470 U.S. 811, 816 (1985) (fingerprints properly suppressed where defendant was illegally detained and fingerprinted solely for investigative purposes).

[28]The information about the connection of Nguyen and Hak to the first-floor apartment came to light only after the search, as Officer Downs's affidavit indicates by omission.

to the agents; and (3) the agents had no information implicating any defendant as a drug dealer, much less an established and successful one.[29]

8. For the same reasons that there was no probable cause to search 55 Dunstable Road, there was even less cause to search 220 Fayette Street. (This is true even if the observations of drug paraphernalia inside 55 Dunstable Road are taken into account). The affidavit states no more than that the Nissan was registered to a third person (not a defendant) who lived at 220 Fayette Street,[30] that one of the defendants (Hak) claimed to live at that address, and that a white male in a car rented in New York had driven to 220 Fayette Street accompanied by the Nissan and had been greeted by several Asian males who watched him lift a box out of the trunk of his car.[31]

## ORDER

For the foregoing reasons, the motion to suppress the physical evidence seized from 55 Dunstable Road is <u>ALLOWED</u> as to defendants Hak, Nguyen, and Scott, and <u>DENIED</u> as to defendant Eng.[32] The motion to suppress evidence seized from 220 Fayette

---

[29]If after the defendants were identified, agents learned that they had prior records of drug dealing, there is no indication of such in Officer Downs's affidavit.

[30]The affidavit does not connect the minivan to 220 Fayette Street.

[31]The refusal of the occupants of 220 Fayette Street to permit a warrantless search of the house has no evidentiary weight. See United States v. Thame, 846 F.2d 200, 206 (3d Cir. 1988).

[32]Nguyen and Hak also move to suppress the seizure of their personal cell phones, arguing that the seizures were fruits of the illegal sweep of 55 Dunstable Road. This aspect of the motion is based on a misstatement of the facts. The phones were not taken from inside 55 Dunstable Road, but were seized pursuant to lawful searches incident to arrest, or in the case of Nguyen, a lawful search of the vehicle she was using. See United States v. Robinson, 414 U.S. 218 (1973); United States v. Ross, 456 U.S. 798 (1982).

Street is <u>ALLOWED</u> as to defendants Hak and Eng, and <u>DENIED</u> as to defendants Nguyen and Scott.[33]

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[33]The government does not argue in the alternative that the fruits of the searches of Dunstable Road and Fayette Street might have been salvaged by the independent source/inevitable discovery rule, nor can the court imagine a basis upon which such an argument could be made.